___



SO ORDERED,

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

The Order of the Court is set forth below. The case docket reflects the date entered.
___

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | | |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| MICHAEL ALEX WHITE, | ) | Case No.: | 13-12043 |
| | ) | | |
| Debtor. | ) | Chapter: | 7 |
| | / | | |

## MEMORANDUM OPINION AND ORDER GRANTING UNITED STATES TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 707(b)

This matter came before the Court for hearing on April 23, 2014, on the Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) (the "Motion")(Dkt. # 83) filed by the United States Trustee (the "Trustee") in the chapter 7 bankruptcy case of Michael Alex White (the "Debtor"). At the hearing on the Motion, Sammye Tharp appeared as attorney for the Trustee, and Gawyn Mitchell appeared as attorney for the Debtor. The Debtor and Ronnie Walker, a bankruptcy analyst with the Trustee's office, also appeared and testified. Following the hearing, both the Debtor and the Trustee submitted letter briefs to the Court (Dkts. # 108 and 109, respectively), citing additional authority for their respective positions.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b) and the United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc dated August 6, 1984. This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. §

1

157(b)(2)(A), (L), and (O).  The Court has considered the pleadings, admitted evidence, argument of counsel, and applicable law.  In this case, the Court must determine whether an above-median chapter 7 debtor, in completing the means test form, may deduct payments to formerly secured creditors on property the Debtor intended to surrender on the petition date, and has in fact surrendered during the pendency of the case.  For the reasons set forth below, this Court concludes that § 707(b)(2)(A)(iii) allows for deduction of payments to secured creditors only if those payments are to actually be made.

## I. FINDINGS OF FACT[1]

The Debtor filed his chapter 7 petition for relief on May 7, 2013 (Dkt. # 1).[2]  The Debtor is currently 64 years old, but will turn 65 later in 2014.  He is a physician who practiced as an anesthesiologist for approximately 32 years until he was determined to be disabled in 2008 as the result of hearing loss.  After ceasing practice as an anesthesiologist, the Debtor opened a medical practice devoted to pain management.  In 2011, the Debtor was investigated by the Drug Enforcement Agency ("DEA").  He voluntarily surrendered his license to prescribe controlled substances ("License") to the DEA in October 2011 in anticipation of criminal charges he expected to be filed against him.  The Debtor was indicted by a federal grand jury on February 22, 2012, for his alleged involvement in a diet pill conspiracy, but a jury acquitted the Debtor of all charges in November 2012.  The Debtor has been attempting to regain his License from the DEA so he can reopen his pain management practice.  He filed a lawsuit against the DEA on April 5, 2013, seeking reinstatement of the License.  That lawsuit was dismissed when the

---

[1] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such.  To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

[2] The facts were stipulated for purposes of the Motion, unless otherwise noted (Dkt. # 106).

district court determined that it did not have subject matter jurisdiction, because the Debtor had failed to first exhaust his administrative remedies as required by federal law.

The Debtor is married and has a stepdaughter who lives with him and his wife. The Debtor's current Schedule I reflects a monthly household income of $15,386.75, which includes $15,000 in private disability insurance payments to him. The remainder of the household income is attributable to his wife's self-employment income of $386.75.[3] The Debtor's disability insurance payment will decrease to around $10,000.00 upon his 65th birthday, but he will be eligible for approximately $2,400.00 in Social Security benefits at the same time. The Debtor listed $1,766,833.00 in secured debt, $30,757.97 in unsecured priority debt, and $211,523.72 in general unsecured debt in his bankruptcy schedules (Dkt. # 7, 20). He is ineligible for relief under chapter 13 of the Bankruptcy Code because he is above the debt limits permitted in chapter 13. 11 U.S.C. § 109(e).

The Debtor's secured debt included $997,000 to the Bank of Vernon ("BOV") and $263,000 to Central Leasing Company ("CLC"), each formerly secured by his home in Lowndes County, Mississippi (Dkt. # 7, 20). The Debtor also scheduled $384,000 owed to Green Tree Servicing, LLC ("GTS"), formerly secured by a Pennsylvania lodge, and $25,000 owed to BOV, formerly secured by an X-ray Machine (Dkt. # 7). The Debtor's Statement of Intention, Schedules, Statement of Financial Affairs, and other documents filed on June 3, 3013, reflect that the Debtor intended from the beginning of this case to surrender the home, the lodge, and the X-ray machine to the secured creditors (Dkt. # 7). The Debtor did surrender the home to BOV on July 19, 2013, BOV foreclosed, and the Debtor is leasing it back from an entity owned by BOV

---

[3] The Debtor testified that his wife's income has increased because she is now employed as an aesthetician, but that she uses her income for her own purposes and does not contribute to household expenses or even her own living expenses. The Debtor's wife is not a debtor in this case nor has she filed her own bankruptcy petition.

3

at a cost of $3,000.00 per month. The lodge and the X-ray machine were also surrendered to the respective lienholders, which have also foreclosed.

The Trustee contends that this case should be presumed an abuse of the Bankruptcy Code under § 707(b)(2)[4] or, in the alternative, that the case presents an abuse under § 707(b)(3)(B), after consideration of the totality of the circumstances. While the Trustee takes issue with many of the Debtor's claimed expenses that exceed the Internal Revenue Service's ("IRS") standard allowance, and some of those expenses would be due to be disallowed upon review, the parties agree that whether or not the Debtor's case is presumed abusive turns on the Court's determination of whether the secured payments on surrendered property are properly deducted on Line 42 of Debtor's Official Form B22A, the Chapter 7 Statement of Current Monthly Income and Means Test Calculation. The Debtor's Amended Form B22A (the "Means Test Form")(Dkt. # 28) includes the following deductions for collateral which the Debtor always intended to, and in fact did, surrender: $10,000.00 for the average monthly payment to BOV for the first mortgage on the Debtor's home, $4,400.00 for the average monthly payment to CLC on the second mortgage on the Debtor's home, $416.67 for the average monthly payment to BOV for the X-Ray machine, and $4,048.00 for the average monthly payment to GTS, for the mortgage on the Pennsylvania lodge. This results in a total deduction of $18,864.67 in monthly payments on secured claims that the Debtor both did not intend to pay at the time he filed this bankruptcy case, and is not paying, going forward.[5] The Trustee contends that the inclusion of these phantom payments is improper, and that the Debtor's case must therefore be presumed to be an abusive filing under § 707(b)(2).

---

[4] All statutory references are to Title 11, United States Code (the "Code" or the "Bankruptcy Code"), unless otherwise noted.

[5] Line 42 of the Means Test Form also included $1,611.23 in monthly payments for vehicles the Debtor intended to retain and reaffirm, for a total deduction of $20,475.90.

4

## II. CONCLUSIONS OF LAW

**A. The Means Test, Generally.**

Section 707(b) applies to individual debtors with primarily consumer debts. The parties agree that the Debtor is an individual and that his debts are primarily consumer debts. Section 707(b)(2) of the Bankruptcy Code mandates dismissal (or consensual conversion) of a chapter 7 case filed by an individual debtor with primarily consumer debts when the granting of relief would be an abuse of the provisions of chapter 7. The objective financial test – known as the "means test" – that determines whether or not the presumption of abuse arises under § 707(b)(2) is embodied in Official Form B22A. *In re Benedetti,* 372 B.R. 90, 92 (Bankr. S.D. Fla. 2007).

If a debtor's current monthly income is lower than the state median income for a household of the same size, then the means test does not apply.[6] 11 U.S.C. § 707(b)(7). The Means Test Form prepared by the Debtor reflects that the Debtor's currently monthly income is $15,500.00, which translates to a yearly income of $186,000.00 (Dkt. # 28). The Debtor's income far exceeds Mississippi's median income of $46,062.00 for a family of three[7], and therefore, the means test applies in this case. Under the means test, a debtor may claim IRS local standard deductions for a variety of expenses, such as housing and transportation, but a debtor is instead permitted to claim higher actual expenses for secured debt payments. A presumption of abuse arises if a debtor's current monthly income, reduced by the allowed deductions and multiplied by 60, is not less than the lesser of (I) 25 percent of the debtor's unsecured claims, or $7,475.00, whichever is greater, or (II) $12,475.00. § 707(b)(2)(A)(i).

---

[6] Although the means test does not apply, a chapter 7 below-median debtor may still face dismissal for abuse under § 707(b)(3), if the case is filed in bad faith or the totality of the circumstances demonstrates abuse.

[7] United States Trustee Website, Census Bureau Median Family Income by Family Size (Cases filed between 5/1/13 and 11/14/13, Inclusive), *at* http://www.justice.gov/ust/eo/bapcpa/20130501/bci_data/median_income_table.htm

The Means Test Form as prepared by the Debtor indicates that the presumption of abuse does not arise, because the deductions taken by the Debtor for monthly payments on secured debt for collateral the Debtor surrendered leaves him with a negative monthly disposable income of $8,116.53 (Dkt. # 28). The Trustee concedes that if the Debtor is permitted to deduct the secured payments on the surrendered property, then the Debtor does not have enough income for the presumption of abuse to arise.

Removing the deductions for the surrendered home, lodge, and X-ray machine, but adding back in the local standard deduction for housing of $772, yields a positive monthly disposable income of $10,748.14 without even considering the Trustee's objections to other deductions taken by the Debtor. If these phantom deductions are disallowed, the presumption of abuse does arise, and, absent a showing of "special circumstances" (which were not alleged by the Debtor), the Debtor would not qualify for relief under chapter 7 of the Bankruptcy Code. § 707(b)(2)(B). The Debtor concedes this point. Hence, the parties agree that the means test analysis in this case turns on whether the Debtor may deduct the phantom payments under § 707(b)(2)(A)(iii). That subsection provides:

> The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—
> **(I)** the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and
> **(II)** any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

B. **Judicial Interpretations of § 707(b)(2)(A)(iii).**

Since the implementation of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[8], two distinctive lines of cases have emerged as courts have struggled with the issue of whether a secured debt for collateral that a debtor intends to surrender is "scheduled as contractually due," and thus may be deducted for purposes of the means test under § 707(b)(2)(A)(iii)(I). *In re Kogler*, 368 B.R. 785 (Bankr. W.D. Wisc. 2007).

The parties were candid in their arguments that there is no controlling precedent in the Fifth Circuit. Each line of cases contains valid analysis and conclusions. One line of cases adopts the "snapshot approach," which essentially finds that the means test is intended as a snapshot of secured payments due on the petition date, and that the debtor's intent to make the payments is irrelevant. *See, e.g., In re Lindstrom*, 381 B.R. 303 (Bankr. D. Colo. 2007). Under the snapshot approach, if the secured payments were contractually due on the petition date, those payments may be deducted from the debtor's income under the means test, even if the payments will never be made. *Id.* Other courts employ a more forward-looking, or reality-based, approach. Generally, these courts find that if payments are not going to be made to secured creditors, then the debtor may not deduct the payment amount in the means test analysis. *See, e.g., In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006). Each approach is examined below.

1. **"Snapshot" Approach.**

The courts that have adopted the snapshot approach generally hold that bankruptcy courts are constrained to apply the mathematical calculations called for in Official Form B22A in a vacuum, and allow deduction of the secured payments, without regard to whether the debtor will actually make the payments. *See, e.g., Lindstrom*, 381 B.R. 303; *In re Hayes,* 376 B.R. 55 (Bankr. D. Mass. 2007); *Benedetti*, 372 B.R. 90; *Kogler*, 368 B.R. 785; *In re Sorrell,* 359 B.R.

---

[8] Publ. L. No. 109-8, 119 Stat. 23 (codified as amended at 11 U.S.C. § 101, *et seq.*).

167 (Bankr. S.D. Ohio 2007); *In re Randle,* 358 B.R. 360 (Bankr. N.D. Ill. 2006); *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006). Courts adopting this position do so, in many instances, at least partially based on the reasoning that Congress intended to remove judicial discretion from the determination of what constitutes abuse by implementing the mathematical exercise that is the means test.[9] Advocates of the snapshot approach contend that the means test is intended to determine a debtor's eligibility for chapter 7 relief as of the petition date without regard to known future circumstances which impact a debtor's income or expenses. *See, e.g., Kogler*, 368 B.R. at 789-90. In support of this position, snapshot-approach courts also rely on principles of statutory construction, holding that the statute is unambiguous, and thus, a court must simply apply it as written, unless literal application would lead to "absurd results." *In re Rudler*, 576 F.3d 37, 50 (1st Cir. 2009)(citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004))(further citations omitted).

Section 707(b)(2)(A)(iii) provides a debtor may deduct "the total of all amounts scheduled as contractually due to secured creditors" in the 60 months post-petition. Courts adopting the snapshot approach to the means-test calculations interpret "scheduled as" according to its "common, dictionary-defined meaning," as "planned for a certain date." *In re Fredman,* 471 B.R. 540, 544 (Bankr. S.D. Ill. 2012)(citing *Rudler*, 576 F.3d at 47). Given this interpretation, as well as finding that the statute is unambiguous, these courts hold that the statute allows a debtor to deduct all payments on secured debt due over the 60 months post-petition

---

[9] Pre-BAPCPA, the Code simply provided that a Court could dismiss a chapter 7 debtor's bankruptcy case if the granting of relief would be a "substantial abuse" of chapter 7. Bankruptcy courts had significant discretion to determine what constituted substantial abuse. When BAPCPA was enacted, the means test formula was added as § 707(b)(2). The more amorphous "totality of the circumstances" standard remains as § 707(b)(3)(B). Ordinarily, a court will not punish a debtor under one subsection of the Bankruptcy Code for something that he or she is permitted to do under another subsection. *See Beaulieu v. Ragos (In re Ragos)*, 700 F.3d 220, 227 (5th Cir. 2012).

without regard to whether or not the debtor intends to retain the collateral and actually make these payments. *Id.*

### 2. Forward-looking approach.

Courts employing the forward-looking, or reality-based approach, hold that debtors may not deduct expenses for payments that will not be made. *See, e.g., In re Byers,* 501 B.R. 82 (Bankr. E.D.N.C. 2013); *Fredman,* 471 B.R. 540; *In re King*, 2008 WL 1808522 (Bankr. S.D. Tex. 2008); *In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006); *Skaggs*, 349 B.R. 594. The court in *Skaggs* pointed out that one of Congress's primary intents in passing BAPCPA was "to ensure that those debtors who can pay their debts do so." *Skaggs*, 349 B.R. at 600 (citing *In re Hardacre*, 338 B.R. 718, 725 (Bankr. N.D. Tex. 2006)). Courts adopting the reality-based approach reason that the result of a chapter 7 debtor's surrender of collateral is that the debtor is no longer required to make the formerly-scheduled installment payments and the secured debt no longer exists. *In re Thompson*, 457 B.R. 872 (Bankr. M.D.Fla.). No secured debt remains at that point—the former secured creditor may simply have an unsecured claim for a deficiency balance. *Harris,* 353 B.R. at 309. "Creditors to whom payments are not being made and the collateral is surrendered are no longer 'secured creditors.'" *Thompson*, 457 B.R. at 881.

Some courts that have adopted the forward-looking approach interpret the "scheduled as" language of § 707(b)(2)(A)(iii) as a term of art in the bankruptcy context, referring to whether a debt is identified on a debtor's bankruptcy schedules. *Skaggs*, 349 B.R. at 599. Thus, if the debtor's bankruptcy schedules reflect his intention to surrender collateral and to cease paying the attendant debt, the future payments on these once-secured loans are no longer "scheduled." Courts that take this position support it by referencing the principle of statutory construction that mandates that a court give effect, if possible, to every clause and word of a statute. *Fredman*,

9

471 B.R. at 544 (citing *Harris*, 353 B.R. at 307). These courts reason that the snapshot-approach interpretation of "scheduled as contractually due" renders the words "scheduled as" superfluous, as all the snapshot-approach requires is that such payments be "contractually due." *Id.*

### 3. Statutory ambiguity.

It is axiomatic that the plain language of a statute is conclusive unless the literal application of the statute would produce a result "demonstrably at odds" with congressional intent. *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989)(citation omitted). Courts have struggled with how to interpret the language of § 707(b) post-BAPCPA. Those adopting the snapshot approach generally hold that the statute is not ambiguous and that it simply asks for a present-tense list of secured debts which may lead to the deduction of phantom payments from a debtor's income in applying the means test. Statutory construction is, however, a "holistic endeavor." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). Although many courts have determined that the language "all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition" is not ambiguous, the fact that bankruptcy courts across the nation cannot agree on its meaning indicates otherwise. Further, in interpreting one part of a statute, such as the "scheduled as contractually due" language of § 707(b)(2)(A)(iii), "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122 (1849)(quoted in *U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 455 (1993)).

Both lines of cases make valid points regarding the ambiguity (or lack thereof) of the statutory language and the competing Congressional intent underlying the changes to § 707(b) under BAPCPA. In the absence of a controlling Court of Appeals for the Fifth Circuit decision

on this issue, this Court is more persuaded by the reasoning of the courts that determine that the language in § 707(b) is ambiguous. In resolving this ambiguity, this Court is further more persuaded that the forward-looking approach is the correct methodology. In order to deduct payments on secured debt "scheduled as contractually due," a debtor must intend to actually make the payments going forward, and certainly must not have already surrendered the collateral (thus making no payments scheduled and due). This approach has the advantages of being based in reality, as well as being more in line both with the congressional intent that debtors repay what they are able and with the United States Supreme Court's rationale in interpreting § 707(b) in other contexts, as discussed below.

### 4. United States Supreme Court Precedent.

Two recent United States Supreme Court cases are instructive on this issue. The Supreme Court's decision in *Hamilton v. Lanning,* 560 U.S. 505 (2010) arose out of a dispute in a chapter 13 case. Section 1325 of the Bankruptcy Code provides that if an objection to confirmation of a chapter 13 plan is filed, the debtor must either pay his unsecured creditors in full or submit all of his "projected disposable income" for the applicable commitment period to fund the plan. § 1325(b). In *Lanning,* the debtor received a one-time payment from a former employer which, when factored into the calculation of currently monthly income, artificially raised the amount of the "projected disposable income" she was expected to pay into the plan. *Lanning*, 560 U.S. at 511. The Bankruptcy Code does not define "projected disposable income," but a debtor's disposable income is her current monthly income, less expenses that are reasonably necessary to be expend for maintenance and support. 11 U.S.C. § 1325(b)(2). Section 1325(b)(3) provides that expenses are to be determined in accordance with § 707(b)(2)(A) and (b)(2)(B). The Supreme Court determined that when calculating a debtor's

11

projected disposable income, the bankruptcy court "may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Lanning,* 560 U.S. at 524. In other words, in *Lanning*, the Supreme Court, while interpreting § 707(b)(2)(A)(iii), the same provision this Court is now considering, adopted a forward-looking, reality-based approach in calculating a chapter 13 debtor's "projected disposable income," holding that the "Code does not insist upon rigid adherence to the mechanical approach in all cases." *Id.* at 522. The Supreme Court rejected the mechanical approach in determining projected disposable income in that case, because that approach did not take into account the undisputed fact that the debtor's actual income was insufficient to make the plan payments mandated by the mechanical approach. *Id.* at 520-22. The Supreme Court recognized that "pre-BAPCPA practice allowing discretion had not been discarded with the BAPCPA amendments." *Fredman*, 471 B.R. at 548 (citing *Lanning*, 560 U.S.at 515-16 and n.4).

While *Lanning* dealt with the income side of the definition of projected disposable income, just a few months later, the Supreme Court also considered the expense side of the equation. *In re Ransom,* 562 U.S. ---, 131 S.Ct. 716 (2011). In *Ransom,* the Supreme Court again considered § 707(b)(2)(A) in a chapter 13 case, holding that a debtor who does not make vehicle loan or lease payments on his car may not claim the IRS standard deduction for vehicle-ownership costs.[10] The Court in *Ransom* focused on the "overall purpose of BAPCPA" in ensuring that debtors "repay creditors the maximum they can afford." *Id.* at 725 (citation to legislative history omitted). In addition, the Supreme Court recognized that the purpose of BAPCPA is "best achieved by interpreting the means test, consistent with the statutory text, to reflect at debtor's ability to afford repayment." *Id.*, citing *Lanning*, 560 U.S. 505 (noting that

---

[10] *Ransom* abrogated a previous Fifth Circuit decision, *Tate v. Bolen (In re Tate)*, 571 F.3d 423 (5th Cir. 2009)(holding that chapter 7 debtors could deduct the transportation ownership expense despite not making actual vehicle lease or loan payments).

12

*Lanning* rejected an interpretation of the Bankruptcy Code that "would produce the senseless result of denying creditors payments that the debtor could easily make."). Although both *Lanning* and *Ransom* were chapter 13 cases, both interpreted § 707(b). If *Lanning* and *Ransom* are not binding in chapter 7 cases, they are exceptionally close, and the analysis is certainly persuasive. This Court agrees with the court in *In re Johnson*, 454 B.R. 882 (Bankr. M.D. Fla. 2011), which noted:

> The common thread that can be derived from the Supreme Court's analysis in *Lanning* and *Ransom* is that the means test must be applied in light of the debtor's actual circumstances. It should be applied to give effect to its purpose – that is, that debtors who can afford to pay their creditors should pay their creditors.

*Johnson*, 454 B.R. at 889.

"Because Congress intended the means test to approximate the debtor's reasonable expenditures on essential items, a debtor should be required to qualify for a deduction by actually incurring an expense…" *Ransom*, 131 S.Ct. at 720. It stands to reason that if a debtor cannot claim a standard deduction for an expense he does not have, likewise, then, a debtor cannot claim a deduction for actual, specific payments that will not be made. As one bankruptcy court put it, "[a] fictitious expense should not be allowed either during the life of a chapter 13 debtor's plan or in determining the suitability of a debtor's chapter 7 case." *Fredman,* 471 B.R. at 549. Allowing the debtor to deduct phantom expenses would "convert the Bankruptcy Code's purposes of preserving debtors' ability to meet their basic needs and ensuring they have a 'fresh start' into a 'free pass.'" *Clark v. Rameker*, 573 U.S. --- , 134 S.Ct. 2242, 2248 (2014)(internal citations omitted). That said, courts "have not been unanimous in determining whether the 'common thread' of *Lanning* and *Ransom* applies equally" in chapter 7 cases. *In re Rivers*, 466 B.R. 558, 564 (Bankr. M.D.Fla. 2012).

For example, the bankruptcy court in *In re Grinkmeyer*, 456 B.R. 385 (Bankr. S.D. Ind. 2011) declined to apply the forward-looking approach in a chapter 7 case, holding that the chapter 7 means test "is designed as a screening device to determine whether chapter 7 relief is appropriate for a particular debtor, and the 'snapshot approach' best fits within this statutory design." *Rivers*, 466 B.R. at 565 *(citing Grinkmeyer*, 456 B.R. at 387-88). Another bankruptcy court held similarly, concluding that future events or changes in circumstances are not appropriately considered in chapter 7 cases. *In re Sonntag*, 2011 WL 3902999 (Bankr. N.D. W.Va. 2011). In the Fifth Circuit, however, binding precedent provides that future events and changes in circumstances, such as a post-petition increase in income, should be considered in chapter 7 cases. *In re Cortez*, 457 F.3d 448 (5th Cir. 2006).

### 5. Fifth Circuit Court of Appeals Precedent.

The chapter 7 debtor in *Cortez* was unemployed on the petition date, but accepted a job with a $95,000 salary just four days later. *Id.* at 451. Because the Debtor would have been able to repay a much more significant portion of his unsecured creditors in a hypothetical chapter 13 case with his new income, the U.S. Trustee moved to dismiss the case for "substantial abuse" under pre-BAPCPA § 707(b). Thus, the issue before the Court was "whether a bankruptcy court should consider post-petition events in deciding whether to dismiss a case for substantial abuse under § 707(b)." *Id.* at 450. In answering the question in the affirmative, the Fifth Circuit found that the phrase "granting of relief" as used in the former § 707(b) referred to the entry of a discharge, as opposed to the phrase "order for relief," which refers to the imposition of the automatic stay upon the filing of the petition.[11] *Id.* at 455. Accordingly, the Fifth Circuit held in

---

[11] Section 301 of the Bankruptcy Code provides that "[t]he commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter."

14

*Cortez* that "a court may act on the basis of any development occurring before discharge is granted" and that "a substantial abuse determination is *forward looking*." *Id.* (emphasis added).

Although *Cortez* considered the pre-BAPCPA version of § 707(b), the phrase "granting of relief" also appears in the new § 707(b)(1), (2), and (3), which directs the Court to the conclusion that the continued use of the phrase "granting of relief" means that a bankruptcy court may consider post-petition, pre-discharge facts to determine whether a presumption of abuse arises under the § 707(b)(2)(A) means test. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992)(holding that absent clear congressional intent to the contrary, when Congress uses terms that have a settled meaning under the common law, a court must infer that Congress intended to incorporate the established meaning of such term into the statute). In addition, it is undisputed that all debtors have an obligation to amend their schedules during the pendency of their cases, including keeping an accurate Schedule I (income) and Schedule J (expenses) on file. *Cortez*, 457 F.3d at 457-58. If the Court is required to consider a post-petition increase in income in determining whether it is abusive for a particular debtor to remain in chapter 7, then a post-petition decrease in expenses must likewise be considered. There is no indication that the amendments to § 707 made by BAPCPA were intended to change this result. In fact, although § 707 was significantly changed by BAPCPA, the crucial language considered by the *Cortez* court – "granting of relief" – remains the same. Accordingly, phantom expenses may not be deducted during the life of a chapter 13 plan under *Ransom* and *Lanning,* and may not be deducted in determining chapter 7 eligibility under *Cortez*.

### III. <u>CONCLUSION</u>

For the reasons set forth above, this Court holds that the deductions for payments that will not be made are due to be disallowed. Thus, the presumption of abuse arises in this case

under § 707(b)(2). The Debtor did not allege or attempt to show special circumstances, so the presumption of abuse was not rebutted under § 707(b)(2)(B). Because abuse is found under § 707(b)(2), it is not necessary for the Court to consider the Trustee's totality of the circumstances argument under § 707(b)(3).

Accordingly, it is hereby **ORDERED, ADJUDGED, and DECREED** that

1. The Motion is **GRANTED.**

2. The Debtor shall convert this case to chapter 11 within 30 days of the entry of this order, failing which, this case shall be **DISMISSED**.

##END OF ORDER##